**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**

| | | |
|---|---|---|
| | * | |
| MIGUEL ALFONSO URQUIA DOMINGUEZ, | * | |
| Petitioner, | * | Civil Action No. 8:25-cv-02411-PX |
| v. | * | |
| MAIRA HERNANDEZ VASQUEZ, | * | |
| Respondent. | * | |
| | * | |
| | *** | |

**MEMORANDUM OPINION**

Pending is Petitioner Miguel Alfonso Urquia Dominguez ("Urquia Dominguez")' Verified Petition for the return of his minor children E.S.U.H. and L.O.U.H. (collectively "the Children") pursuant to the Hague Convention on the Civil Aspects of Child Abduction, 19 I.L.M. 1501 (1980) ("the Hague Convention" or "the Convention"), a treaty implemented in the United States by the International Child Abduction Remedies Act ("ICARA"), 42 U.S.C. §§ 11601–11610. ECF No. 1. When a parent flees to another country with his or her child, and in contravention of the other parent's rights, the Hague Convention generally requires courts to order the return of the child, unless certain exceptions apply. *Id.* Having reviewed the entirety of the record, the Court concludes that E.S.U.H. and L.O.U.H. were wrongfully removed from Honduras within the meaning of the Convention. Nonetheless, Hernandez Vasquez has demonstrated that returning the Children to Honduras would pose a grave risk to them and, separately, that E.S.U.H. has reached sufficient age and maturity for the Court to account for her objections to return. Thus, the Petition for return must be denied.

## I. Procedural History

On July 24, 2025, Urquia Dominguez filed his Petition seeking the immediate return of the Children. ECF No. 1. After almost three months of delay stemming from Hernandez Vasquez's evasion of service, she secured counsel and responded to the Petition. ECF Nos. 27 & 28. Preliminary motions did not resolve the matter, so the Court held a three-day bench trial during which both parties presented documentary evidence and witness testimony. ECF Nos. 67, 71, & 75. Thereafter, the Court determined that it needed the assistance of an independent forensic psychologist to evaluate the Children, and so, commissioned the parties to recommend evaluators. ECF No. 76. The Court also referred the case for settlement discussions pending the evaluation process. ECF No. 77.

The Court appointed neither of the parties' recommended experts, and instead commissioned Dr. Kelly M. Champion ("Dr. Champion"), a forensic child psychologist, to perform the evaluations. ECF No. 86. Dr. Champion interviewed the Children and parents on multiple occasions and thereafter submitted a thorough and well-documented report on April 21, 2026. *See* DR. KELLY M. CHAMPION, INDEPENDENT FORENSIC ASSESSMENT (2026) (the "Report").

With the benefit of the Report, the parties continued negotiations for some months but without resolution. ECF No. 94. Nor did the parties seek further examination of Dr. Champion or ask to retain a like-kind expert. Instead, the parties asked the Court to rule on the current record. ECF No. 96. Accordingly on July 21, 2026, the Petition became ripe for resolution.

## II. Trial Evidence

The Court bases its decision on the following evidence adduced at trial through five witnesses and a separate in-person interview with E.S.U.H. The Court also admitted the Report to

aid the Court in determining whether returning the Children to Honduras would present a grave risk of harm to them. The Court summarizes the relevant evidence as follows.

### A. The Parents

Urquia Dominguez and Hernandez Vasquez are the biological parents of E.S.U.H. and L.O.U.H., who were ten and six years old when the case began. ECF No. 65 ¶ 4. Both children were born in Honduras and lived on-and-off with both parents in one home. *Id*. ¶¶ 4–5, 7. Hernandez Vasquez became pregnant with E.S.U.H. in 2014 and L.O.U.H. in 2018. Trial Tr. at 12:14–15:1, Jan. 30, 2026.[1] From 2014 to 2018, Hernandez Vasquez and Urquia Hernandez did not live together.[2] *Id*. at 15:3–9. But the parents considered themselves in a committed relationship. *Id*. at 14:11–12. During this time, Urquia Dominguez would visit Hernandez Vasquez and E.S.U.H. once or twice a week. *Id*. at 14:20. Shortly before L.O.U.H. was born, Hernandez Vasquez moved in with Urquia Dominguez in Marcala, Honduras. *Id*. at 15:11–17.

Throughout their ten-plus year relationship, the couple fought often, and according to Hernandez Vasquez, because Urquia Dominguez was "very jealous." Trial Tr. at 16:2–3, Jan. 30. 2026. Hernandez Vasquez describes that Urquia Dominguez would drink to excess and mistreat her in front of the children. *Id.* at 17:3–7. When they would fight, Urquia Dominguez would demand that Hernandez Vasquez "leave his house," at all hours of the night. *Id.* at 17:21–18:9. Urquia Dominguez would also call her "dumb" and "trash," in front of the children. *See id*. at 124:5–19. *See also id*. at 73:10–12 (berating her "all the time" in front of the children); *id*. at 74:12. Although Urquia Dominguez did not hit Hernandez Vasquez in front of the children, he did

---

[1] Trial transcript citations are to the unofficial transcripts.

[2] Although Urquia Domiguez testified on direct that the Children lived with him from birth until October 6, 2024, he then stated during cross examination that he did not remember when Hernandez Vasquez moved in with him but believed it was around 2017. Trial Tr. at 76:2–4, Jan. 28, 2026.

follow her one time, while drunk, into the bathroom, put his hand in the doorway to block her exit, and berated her. *Id.* at 74:19–24.

As to E.S.U.H., Hernandez Vasquez testified that her daughter did not want to spend time with her father from a very young age. Trial Tr. at 26:21–27:1, Jan. 30. 2026. E.S.U.H. would cry and plead to stay with her mother when she learned her father would be picking her up. *Id*. at 23:23–25. When Hernandez Vasquez asked E.S.U.H. why, she said she did not feel "okay" with him. *Id.* at 24:1–5. Despite E.S.U.H.'s pleas to remain with her mother, Urquia Dominguez would take E.S.U.H. by force. *Id*. at 27:9–10. At other times, E.S.U.H. would pretend to be asleep in the hopes that her father would leave her behind. *Id*. at 28:8–20. E.S.U.H.'s refusal to spend time with her father has never wavered. *Id.* at 28:2–4. *See also id.* at 72:4–5 ("my daughter truly almost always refused to go with him.").

Given Urquia Dominguez' volatility, Hernandez Vasquez did not believe she and the Children were safe in the home. Trial Tr. at 18:18–20, Jan. 30. 2026. Also, Urquia Dominguez often had many people over to the home to drink and socialize which, to her, further endangered the Children. *Id*. As a result, Hernandez Vasquez took the Children and moved to her cousin's home on October 6, 2024. *Id*. at 17:8–11. Nonetheless, according to Hernandez Vasquez, Urquia Dominguez' pattern of insults and verbal abuse continued in front of the Children. *Id*. at 75:6–18.

Urquia Dominguez, for his part, agreed that the couple argued often. Trial Tr. at 43:14–15, Jan. 28, 2026. Urquia Dominguez also confirmed that he drank and would invite friends to his home. *Id*. at 84:14–25. But he denied physical or verbal abuse apart from giving the Children an occasional spanking. *Id*. at 44:9–11.

Urquia Domiguez testified that he last saw the Children on December 17, 2024. *Id*. at 24:1–3. Even though the family had been physically apart since October 2024, they stayed in

contact. But then, Hernandez Vasquez began ignoring Urquia Dominguez' phone calls, so he became concerned. *Id*. at 25:22–24. Thereafter, Urquia Dominguez contacted authorities, and he eventually learned that Hernandez Vasquez had removed the Children to the United States, and that they have been living with Hernandez Vasquez' mother in Maryland. *See id.* at 26:13–19. *See also id*. at 28:19–23; *id*. at 88:15–89:14. Hernandez Vasquez also reported that E.S.U.H. did not like to speak to her father when he called. *Id*. at 118:10–14.

Once in the United States, Hernandez Vasquez learned from E.S.U.H. the full reason why she did not want to be with her father. E.S.U.H. particularly told her mother that her father had touched her private parts when she was five and six years old. Trial Tr. at 78:1–6, Jan. 30, 2026. E.S.U.H. first said that her father would "put a lot of saliva on her cheeks." *Id.* at 78:3–4. E.S.U.H. next said that when her father would hug her, he would put his hands down her pants and touch her "intimate part[s]"—front and back. *Id*. at 78:1–15. When asked how often this happened, E.S.U.H. told Hernandez Vasquez that "he wanted to do that almost always, and I removed his hand." *Id.* at 78:9–11.

Startled by the revelation, Hernandez Vasquez sought professional help from Esperanza Counseling LLC. Trial Tr. at 79:18–24, Jan. 30, 2026. *See also id*. at 31:12–13. The family was assigned a licensed clinical counselor, Rosanna De La Rosa, whose fifteen years of experience in the field focused on trauma-based therapy. *Id.* at 31:12–33:22. De La Rosa conducted a telehealth intake assessment of E.S.U.H. which lasted about 60 minutes, half of which was spent alone with E.S.U.H. *Id*. at 49:13–50:10. At first, according to De La Rosa, E.S.U.H. was "very fidgety" and reluctant to talk about interactions with her father. *Id.* at 36:6–7. Eventually, E.S.U.H. made clear that she did not want to "return back to her dad." *Id.* at 36:8–10. *See also id.* at 62:16–17. When asked to explain, E.S.U.H. described that she often witnessed her parents fight when her father

drank; that there was "screaming and [ ] yelling;" and that he often threatened to take her and her brother from their mother. *Id.* at 68:3–12. *See also id*. at 36:15–22. E.S.U.H. also disclosed, in response to an open-ended question about whether "anybody [had] ever done anything that she felt was not appropriate to . . . her body," that when she was around six years old, there were times her dad touched her body in inappropriate ways. *Id.* at 37:13–24. Although De La Rosa did not elaborate on the specifics of E.S.U.H.'s disclosure apart from E.S.U.H. having said her father touched "her privates," *id.* at 59:12–14, she did describe that E.S.U.H. appeared fidgety and distressed when she discussed her father's actions. *Id*. at 38:15–18. De La Rosa asked E.S.U.H. how she was feeling in that moment, and E.S.U.H. described that her "heart was pounding" and "racing," and she felt scared. *Id.* at 38:19–21. De La Rosa also noted in her clinical files that E.S.U.H. had reported nightmares and intrusive memories about Urquia Dominguez. *Id.* at 40:8–13. In the end, albeit based on limited interaction with E.S.U.H., De La Rosa's view was that E.S.U.H. suffers from symptoms of post-traumatic stress disorder that would be exacerbated were she to return to Honduras, as opposed to staying in the United States where E.S.U.H. felt "she was not at risk or in danger." *Id.* at 42:23; *see also id*. at 43:10–13.[3]

### B. Court Interview of E.S.U.H.

The Court next conducted an independent interview with E.S.U.H. in the presence of counsel. The Court confirmed that E.S.U.H. was competent to testify in that she understood the difference between the truth and a lie, and she tried her best to answer the Court's questions truthfully. Trial Tr. at 131:22–134:22, Jan. 30, 2026. E.S.U.H. readily admitted that she spent more time with her mother because she did not like being with her father. *Id*. at 137:13–14. When asked what activities she liked to do with her father, E.S.U.H. said there were none and repeated

[3] Hernandez Vasquez testified that the counseling sessions did not continue because she could not afford them. *See* Trial Tr. at 80:3–7, Jan. 30, 2026.

she did not like to be with her father. *Id*. at 138:3–7. She testified she often cried when having to stay with her father, *id*. at 147:25–148:1, and offered that she did not like to be close to him or be hugged by him. *Id*. at 138:11–12. When the Court asked E.S.U.H. to elaborate, E.S.U.H. started to fidget and spin in her seat. She described that when giving her hugs, her father would place his hands inside of her clothes and touched her buttocks. *Id*. at 138:11–139:17. E.S.U.H. also described that her father touched her "front" indicating to her genitalia. *Id.* at 139:9–12. When asked how the touching made her feel, she responded "[i]t made me feel like–I didn't like it. I was like scared and I would pull away from him." *Id.* at 139:20–21. When asked how often this happened, she said "almost always, so I didn't like it, and I would stay apart from him, and I didn't like it when he hugged me because he would put like saliva on my face, and I didn't like that." *Id.* at 139:24–140:2.

E.S.U.H. testified that she had told her mother that she did not like being hugged by her father. Trial Tr. at 141:3–19, Jan. 30, 2026. When asked by the Court if she told her mother that her father touched her private parts, E.S.U.H. said she would always tell her mother, and her mother told E.S.U.H. to tell her father to stop and to stay away from him. *Id.* at 141:19–142:3.

E.S.U.H. also described to the Court that her parents argued frequently in front of her and L.O.U.H. Trial Tr. at 145:20–23, Jan. 30, 2026; *see also id*. at 146:18–20. She testified that Urquia Dominguez would call Hernandez Vasquez stupid, dumb, or childish. *Id*. at 146:13–17. She also stated Urquia Dominguez spent most of his time drinking alcohol and coming home at 12:00 a.m. or 1:00 a.m. *Id*. at 148:2–4. E.S.U.H. recalled a few occasions where her father would drink alcohol with his friends at home and play loud music while she, her mother, and brother tried to sleep. *Id*. at 150:19–23.

E.S.U.H. testified that, sometime after arriving to the United States, she disclosed to Hernandez Vasquez that Urquia Dominguez had touched her inappropriately. *Id*. at 144:10–145:16. When asked about the conversation, E.S.U.H. became visibly upset and did not want to talk further.

E.S.U.H. also told the Court she did not want to return to Honduras to be with her father. She testified she did not want to see him and would not feel safe if she had to go back to him. *Id*. at 153:11–23. *See also id*. at 155:16–19. She also did not think her brother would be safe if he were sent to Honduras to be with her father. *Id*. at 155:20–156:2. She further stated she feels safe living in the United States even though she still has nightmares about her father grabbing her and not letting go. *Id*. at 154:11–19.

**C. Forensic Psychological Report of Dr. Kelly M. Champion**

Following the bench trial, the Court received the forensic psychological report of the independent examiner, Dr. Champion. Dr. Champion holds a Ph.D. in Clinical Child Psychology from the University of Kansas and has practiced in this field for over 25 years. *See* Report at 46, 48. Throughout, Dr. Champion has regularly conducted child and adult forensic mental health evaluations alongside her clinical practice in which she treated patients suffering from "adult and childhood trauma," and "parent-child relationship problems." *Id*.

The Court asked Dr. Champion to ascertain whether, from a psychological perspective, return to Honduras would harm the Children. ECF No. 86. To that end, Dr. Champion reviewed the trial transcripts and evidence, conducted recorded separate interviews with the parties and the Children, and authored a sixty-one-page report. In it, Dr. Champion opines that, to a reasonable degree of certainty in her field, "ESUH is at grave risk of harm if returned to Honduras because ESUH has been the victim of sexual abuse and psychological/ emotional abuse by Father." Report

at 27. Dr. Champion explained that "E.S.U.H. has repeatedly reported that Father has put his hands on her buttocks and moved them around to touch her vulva under and over her clothes more than once. She reported that he has licked her face. He also was seeking increased time alone with ESUH and taking to [sic] her spend [sic] with him alone in his home. She is afraid of his displays of anger. She is afraid of being near him or reminder of him because of the abuse." Report at 28. Dr. Champion further credited E.S.U.H.'s account because the "disclosures of being touched sexually are consistent across settings since the family arrived in the USA." *Id*. at 29. E.S.U.H. also disclosed to Dr. Champion that her father has hit her on the top or side of her head "in anger more than once," and that E.S.U.H. tried to hide her tears from him because she feared that would only anger him further. *Id*. at 40. E.S.U.H. recalled her father saying he had that reaction because he lacks "patience." *Id.* Dr. Champion ultimately opines that E.S.U.H. suffers from post-traumatic stress disorder as exhibited by "heightened physiological arousal when exposed to or reminded of Father," persistent fear "even in physically safe circumstances," and her expectation that she will suffer psychological harm if returned to Honduras. *Id*. at 34.

As for L.O.U.H., Dr. Champion opines that,

> LOUH is at risk of grave harm if he returns to Honduras and Father's care because Father has not protected LOUH from violence, has sexually abused LOUH's sister, and has not independently met LOUH's needs for competent caregiving. Thus, LOUH is a grave risk of harm due to physical and psychological abuse and at risk for chronic and serious emotional, behavioral, cognitive, and social problems.

Report at 31–32.

Although Dr. Champion noted that L.O.U.H. reports no direct physical or sexual abuse, or even any knowledge of his father's actions toward his sister, L.O.U.H. also did not want to be interviewed and appeared distressed. *See* Report at 32. Nor would he promise to tell the truth, because he "might not remember the truth." *Id.* at 32. He also "denied experiencing almost all feelings—including happy feelings." *Id*. at 32. But L.O.U.H. reacted positively to talking about

his father, and stated his father was always with him when he would go to his father's work. *Id.* at 33. L.O.U.H.'s apparent fealty to his father also, in Dr. Champion's view, makes it more likely that L.O.U.H. would not disclose any adverse behaviors or "protect himself in his father's care." *Id*. In the end, according to Dr. Champion, "the data support finding ESUH to have been sexually abused and physically abused. Based on the intimate partner violence, both children are the victim of psychological abuse when Father's rage at Mother takes precedence over the children's needs for protection, stability, and []care. Although LOUH has not disclosed abuse, Father has not been able to protect the children from violence and meet their needs." *See* Report at 43.

## III. Analysis

The Hague Convention signatories, of which the United States is one, promised together "to protect children internationally from the harmful effects of their wrongful removal or retention[,] and to establish procedures to ensure their prompt return to the State of their habitual residence, as well as to secure protection for rights of access." Hague Convention, 19 I.L.M. at 1501. The "'core premise'" of the Convention is that the "'interests of children . . . in matters relating to their custody' are best served when custody decisions are made in the child's country of 'habitual residence.'" *Golan v. Saada,* 596 U.S. 666, 670 (2022) (quoting *Monasky v. Taglieri*, 589 U.S. 68, 72 (2020)). *See also* Hague Convention, pmbl., 19 I.L.M. at 1501. Accordingly, the return of the child to his habitual residence remains a central aim of the Convention to ameliorate and dissuade a parent's wrongful removal to another country. Hague Convention, pmbl.,19 I.L.M. at 1501. *See also Miller v. Miller,* 240 F.3d 392, 398 (4th Cir.2001) (discussing the ameliorative effect of dissuading international parental removal).

Importantly, the Hague Convention does not confer on federal courts the power to adjudicate questions of custody. *Golan,* 596 U.S. at 668. Rather, the Court's mandate is narrowly

confined to ascertaining whether a child has been "wrongfully removed" from his or her habitual country of residence such that return must be compelled. 22 U.S.C. § 9003(e)(1)(A). Removal or retention is "wrongful" under the Convention if: (1) the child was a habitual resident in the petitioner's country of residence at the time of removal; (2) the removal violated the petitioner's custody rights under the law of the home country; and (3) the petitioner had been exercising those rights at the time of removal. *Bader v. Kramer*, 484 F.3d 666, 668 (4th Cir. 2007) (citation omitted). The parent who seeks compelled return must demonstrate by a preponderance of evidence that the child has been "wrongfully removed." 22 U.S.C. § 9003(e)(1)(A). If the parent-petitioner satisfies his burden of showing wrongful removal, the parent-respondent must return the child unless she demonstrates the existence of one or more narrowly circumscribed exceptions. *See Miller*, 240 F.3d at 398 (citing 22 U.S.C. § 9003(e)(2)(A)) .

There is little doubt that Urquia Dominguez has met his burden of demonstrating wrongful removal, and Hernandez Vasquez does not meaningfully defend against such a finding. Urquia Dominguez enjoyed joint custody of the Children; he was exercising his parental rights at the time Hernandez Vasquez fled to the United States with the Children, and Hernandez Vasquez had not obtained Urquia Dominguez' permission in advance of taking them beyond the Honduran borders, and the removal violated Honduran custody law. Thus, the Court concludes that their removal was wrongful under the Hague Convention.[4]

[4] During trial, the parties stipulated the existence of the first and second elements of the wrongful removal analysis and averred the only remaining questions was whether Urquia Dominguez was exercising his custodial rights at the time the Children were removed. Trial Tr. at 7:8–8:13, Jan. 28, 2026. The Court easily finds that he was. The Fourth Circuit makes clear that courts should "liberally find 'exercise' whenever a parent with de jure custody rights keeps, or seeks to keep, any sort of regular contact with his or her child." *Bader*, 484 F.3d at 671 (quoting *Friedrich v. Friedrich*, 78 F.3d 1060, 1065 (6th Cir. 1996)). "Under this approach, a parent with custody rights under the law of the country of the child's habitual residence cannot fail to exercise those rights short of 'acts that constitute clear and unequivocal abandonment of the child.'" *Id*. The broad definition of "exercise" is necessary, in part, because a determination on the adequacy of one parent's exercise of custodial rights comes "dangerously close" to the merits of the custody dispute, which the Hague Convention forbids a court from deciding. *Friedrich*, 78 F.3d at 1065. Urquia Domiguez lived with the Children and Hernandez Vasquez for many years until shortly before their removal from the

Rather, the true fighting ground remains whether Hernandez Vasquez has demonstrated that one of the exceptions to wrongful removal applies. *See Luis Ischiu v. Gomez Garcia*, 274 F. Supp. 3d 339, 345 (D. Md. 2017) (citing *Miller*, 240 F.3d at 398). Hernandez Vasquez urges the Court to deny the Petition under two such exceptions: (1) the Children will suffer grave risk of harm if returned to Honduras and (2) the Children object to their return. The Court considers each exception separately.

**A. Grave Risk**

A child faces a "grave risk" if return to her habitual residence would "expose the child to physical or psychological harm or otherwise place the child in an intolerable situation." Hague Convention, Art. 13(b); 22 U.S.C. § 9003(e)(2)(A). *See also Golan*, 596 U.S. at 670–71. Although no one definition of "grave risk" exists, to satisfy this exception, the risk must be something "more than the trauma associated with uprooting and moving the child back to the country of habitual residence." *Luis Ischiu,* 274 F. Supp. 3d at 350 (citation omitted). The respondent must establish by clear and convincing evidence that the "alleged physical or psychological harm is 'a great deal more than minimal.' Indeed, the harm must be 'something greater than would normally be expected on taking a child away from one parent and passing him to another.'" *Baxter v. Baxter*, 423 F.3d 363, 374 n.8 (3d Cir. 2005) (quoting *Whallon v. Lynn*, 230 F.3d 450, 459 (1st Cir. 2000)).

Certainly "domestic abuse can provide a basis for a finding of grave risk," as could "sexual abuse." *Luis Ischiu*, 274 F. Supp. 3d at 350 (citing the Hague International Convention; Text and

---

family home. Urquia Dominguez last saw the Children just days before they traveled to the United states. Further, once removed, he searched for the Children, sought law enforcement and international assistance, and provided financial support for them as he could. Accordingly, Urquia Dominguez was exercising his rights at the time the Children were removed and has not abandoned them since. *Cf. Walker v. Walker*, 701 F.3d 1110, 1121–22 (7th Cir. 2012) (finding father was exercising his custody rights at the time of removal when he kept in "'regular contact" with the children by speaking to them weekly over Skype and making multiple requests for visitation); *Bader*, 484 F.3d at 671 (finding petitioner was exercising his custody rights, at the time of removal, where he had physical custody of the child on at least three occasions during a three-month period and paid child support).

Legal Analysis, 51 Fed. Reg. 10494–01, 10510 (Mar. 26, 1986) ("An example of an 'intolerable situation' is one in which a custodial parent sexually abuses the child.")). *See also Golan*, 596 U.S. at 680 (sexual and physical abuse constitute "intolerable situation[s]" and "obvious grave risk[s]" to a "child's safety that c[an] not readily be ameliorated"); *Van De Sande v. Van De Sande,* 431 F. 3d 567, 572 (7th Cir. 2005). The grave risk assessment is understandably fact-dependent and requires the Court to make important decisions regarding the credibility of those involved. *Luis Ischiu*, 274 F. Supp. 3d at 352.

The Court concludes that Hernandez Vasquez has met that burden by clear and convincing evidence for each child. The Court begins with E.S.U.H.

**i. E.S.U.H.**

For one, the Court credits E.S.U.H.'s testimony that she has been the victim of her father's repeated and unwanted sexual touching. For a ten-year-old child, E.S.U.H. clearly knew the importance of testifying truthfully. She candidly, with marked emotion and trepidation, described that she did not want to be in her father's presence, because he had repeatedly touched her buttocks and private parts under her clothes, and had kissed her with much saliva. *See* Trial Tr. at 138:11–139:21, Jan. 30, 2026; *see also id*. at 139:24–140:2. E.S.U.H. also previously disclosed to her mother similar information, and subsequently to counselor De La Rosa and to Dr. Champion.

In this respect, Hernandez Vasquez, De La Rosa, and Dr Champion credibly corroborated E.S.U.H.'s account. Notably, to each, E.S.U.H. confirmed that the sexual touching occurred more than once and involved skin on skin contact with E.S.U.H.'s genitalia. *See* Trial Tr. at 37:13–24, Jan. 30, 2026; *id.* at 78:9–11; Report at 28. Indeed, even Urquia Dominguez confirmed to Dr. Champion that he licked E.S.U.H.'s face while playing puppy dog and "inadvertently" touched E.S.U.H.'s buttocks while hugging her. *See* Report at 25–26.

The Court also credits that Urquia Dominguez at times hit E.S.U.H. out of anger and impatience. As a result, according to both Dr. Champion and counselor De La Rosa, E.S.U.H. now suffers from post-traumatic stress disorder and its sequelae, to include recurring nightmares, anxiety, fear, and withdrawal surrounding her future with her father. *See* Report at 34; *see also* Trail Tr. at 39:7–41:18, Jan. 30, 2026. From this, the Court concludes that returning E.S.U.H. to Honduras and to her father's home would, in a very real sense, subject her to grave risk of harm. To avoid placing E.S.U.H. in a physically and emotionally "intolerable situation," the Court must deny the Petition for her return. Hague Convention, Art. 13(b). *Cf. Luis Ischiu*, 274 F. Supp. 3d at 353–54 (grave risk found where father "condoned" sexual abuse and child suffered from post-traumatic stress disorder and clinical depression as a result).

**ii. L.O.U.H.**

L.O.U.H. is a tougher call. He has not suffered direct sexual abuse or physical violence. But that does not end the analysis. "Nothing in the Convention requires that a child must first be traumatized by abuse before the [grave risk] exception applies." *Simcox v. Simcox*, 511 F.3d 594, 609 (6th Cir. 2007) (citing *Elyashiv v. Elyashiv*, 353 F. Supp. 2d 394, 409 (E.D.N.Y. 2005)). The exception is designed to avoid exposing the child to "'physical or psychological danger,'" or placing that child "'in an intolerable situation.'" *Id.* (quoting Elisa Perez–Vera, Explanatory Report ¶ 29, in 3 *Hague Conference on Private International Law, Acts and Documents of the Fourteenth Session, Child Abduction* 1069 (1982)). Thus, "[i]f handing over custody of a child to an abusive parent creates a grave risk of harm to the child, in the sense that the parent may with some nonnegligible probability injure the child, the child should not be handed over, however severely the law of the parent's country might punish such behavior." *Van De Sande v. Van De Sande*, 431 F.3d 567, 571 (7th Cir. 2005).

L.O.U.H., the Court concludes, suffered indirect exposure to his father's pattern of hostility, emotional belittling, and verbal abuse. His mother and sister both attest that L.O.U.H. witnessed Urquia Dominguez's alcohol induced anger towards their mother "all the time." Trial Tr. at 73:10–12, Jan. 30, 2026; *id*. at 146:18–22. L.O.U.H.'s father has also sexually abused his sister repeatedly and to the point that the Court cannot direct her return. This means if the Court ordered L.O.U.H.'s return, he would be left alone—without his sister with whom he is very close—and without any other family member to bear witness or protect him if his living situation turns dangerous. *See* Report at 33–34. *Cf. Elyashiv*, 353 F. Supp. 2d at 409 (citing "the likelihood of future abuse" in refusing to return a child to her father, even though she, unlike her two older siblings, had not experienced physical abuse and was not suffering from post-traumatic stress disorder); *Leonard v. Lentz*, 297 F. Supp. 3d 874, 894–96 (N.D. Iowa 2017) (returning only two siblings would be detrimental to all three where only one sibling's return would pose a grave risk to her medically). Further, returning without his sister would visit the additive punishment of separation from his sole sibling, which itself amounts to a cruel result. Indeed, child victims of sexual and other abuse are not so easily separated, nor should they be. *See Leonard*, 297 F. Supp. 3d at 894–96, (noting courts "faced with the situation of an affirmative defense applying to only one of multiple children . . . have determined the children must be kept together.") (citing *J.M.H. v. A.S.*, [2010] NBQB 275 (Can. N.B. Q.B.); Re S, N, C [2005] NIFam 1 (N. Ir.) (concluding that where one child would face an intolerable situation should he be returned, the younger sibling would likely face a "cruel" separation if he were returned). Thus, because L.O.U.H. faces grave risk associated with separation from his sister and mother, and with no protection once in Honduras, the Court will deny the Petition on this ground.

A final word on the grave risk exception. The Court may, in its discretion, consider whether any "ameliorative measures" exist to mitigate or eliminate the risk that return presents. *Golan*, 596 U.S. at 682. *See also Van De Sande*, 431 F.3d at 571 ("[I]n order to ameliorate any short-term harm to the child, courts in the appropriate circumstances have made return contingent upon 'undertakings' from the petitioning parent.") (*quoting Feder v. Evans–Feder*, 63 F.3d 217, 226 (3d Cir. 1995)). If such ameliorative measures exist, the Court may consider them, but it must still "prioritize the child's physical and psychological safety," and may, in the end, decline to impose such ameliorative measures if "they would not work because the risk is so grave." *Golan*, 596 U.S. at 667, 680.

Importantly, the Court need not consider ameliorative measures where the parties have not offered any. *Golan*, 596 U.S. at 679. That is this. Neither party has argued or even suggested any ameliorative measures in the event the Court concluded a grave risk exists. Although Urquia Dominguez raised the possibility of exploring such measures on cross examination of Dr. Champion, ECF No. 90 at 2, he ultimately did not ask the Court for that opportunity. ECF No. 96. Nor did he ask to supplement the record on this point. Thus, without even the suggestion that any protections could be put in place, the Court must deny the Petition to return the children. *Cf. Luis Ischiu*, 274 F. Supp. 3d at 354-55 (finding no enforceable conditions or "undertakings" could be imposed to protect the child while returning her to the country of habitual residence).

**B. Objection to Return ("Age and Maturity Defense")**

Turning next to whether either child meets the objection-to-return defense, the Court may consider the child's objection to return if she has "attained an age and degree of maturity at which it is appropriate to take account of its views." Hague Convention, Art. 13. The applicability of the defense must be proven by preponderant evidence. 22 U.S.C. § 9003(e)(2)(B).

Expectedly, the age of maturity cannot be reduced to a number. *Luis Ischiu,* 274 F. Supp. 3d at 349. Rather, the Court must assess the individual child and her intellect, clarity, and cogency to determine whether she has reached the age of sufficient maturity such that her opinions may be considered. *Kovacic v. Harris*, 328 F. Supp. 3d 508, 521–23 (D. Md. 2018) (collecting cases). E.S.U.H. has met that standard.

**i. E.S.U.H.**

Throughout, E.S.U.H. presented as mature, intelligent, and articulate. Across two therapists, her mother, and this Court, E.S.U.H. capably expressed her thoughts and feelings and elaborated on her reasoning. She has, in short, handled this serious and solemn process with remarkable calm and clarity. She is, therefore, sufficiently mature for this Court to consider her objections to return. *Cf. Vasconcelos v. Batista*, 512 Fed. Appx. 403, 408 (5th Cir. 2013) (affirming the district court's determination that the thirteen-year-old child had reached an age and degree of maturity); *Castillo v. Castillo*, 597 F. Supp. 2d 432, 441–42 (D. Del. 2009) (finding an eleven-year-old girl had reached an age and degree of maturity); *Leites v. Mendiburu,* Civ. No. 6:07-cv-2004, 2008 WL 114954, at *6 (M.D. Fl. Jan. 9, 2008) (exception applies to "bright, mature, and articulate," thirteen-year-old who sufficiently articulated grounds for opposing return).

Next regarding the child's reasons for not wanting to return, the Court must distinguish between those objections to return recognized under the Hague Convention from a child's wishes more apt for a typical child custody case, "the former being a 'stronger and more restrictive' standard than the latter." *Hirst v. Tiberghien,* 947 F. Supp. 2d 578, 597 (D.S.C. 2013) (citation omitted). When assessing the credibility of the child—a heavily fact dependent undertaking—the Court should pay special attention to the "potential for undue influence by the person who allegedly wrongfully retained the child." *Hazbun Escaf v. Rodriquez*, 200 F. Supp. 2d 603, 615

(E.D. Va. 2002). The Court must also consider whether "'lengthy wrongful retention could enable the child to become comfortable in his or her new surroundings, which may create a desire to remain in his or her new home.'" *Kovacic*, 328 F. Supp. 3d at 523 (citing *Tsai-Yi Yang v. Fu-Chiang Tsui*, 499 F.3d 259, 280 (3d Cir. 2007)). And if, on balance, the child expresses a preference to stay in her new home rather than an objection to return to her previous habitual residence, "the mature child exception is more likely inapplicable." *Davis v. Lake*, 647 F. Supp. 3d 482, 494–95 (W.D. Va. 2022) (citing *Hirst*, 947 F. Supp. 2d at 598).

To be sure, E.S.U.H. enjoys her new home, school and friends and expressed sadness at the possibility she may need to leave them behind. But for E.S.U.H., the main driver remains her flat refusal to return to her father. She does not want to talk to him or even see him. *See* Trial Tr. at 138:3–12, Jan. 30, 2026. *See also id*. at 153:11–15; *see also* Report at 29 (E.S.U.H. does not "want to think about [her father] . . . she just wanted to know that she could leave him behind."). Given the historic abuse she has both witnessed and experienced, her desire to not return to his care is both clear and understandable. It is also genuine and unwavering.

Nor can the Court conclude that Hernandez Vasquez has "coached" E.S.U.H. in this regard. Hernandez Vasquez testified credibly to how E.S.U.H. disclosed the abuse, and corroborated what E.S.U.H. conveyed—that the child has steadfastly refused contact with her father when given the choice. But in the telling, Hernandez Vasquez does not present as a mother attempting to exert undue influence over either child.[5] Nor has Urquia Dominguez tried to color E.S.U.H.'s views

[5] Dr. Champion also did not observe any evidence of "coaching" from either parent, *see* Report at 31. Dr. Champion explains that "[g]ood follow-up questions also can expose coached reports because young children lack the world experience and maturity to improvise from out a scripted coached report to answer follow-up questions. Young children are rarely successfully coached to make false reports reliably in formal interviews." Thus, while such coaching is not impossible, "the data in the file and in scientific literature do not support concluding the ESUH gave a coached false report." *See* Report at 36.

about returning. Accordingly, the Court will deny the Petition as consistent with E.S.U.H.'s wishes not to return to her father. Hague Convention, Art. 13.

**ii. L.O.U.H.**

The Court next turns to the age and maturity exception as it applies to L.O.U.H. Unlike his sister, no evidence supports that he can form a mature and well-reasoned opinion about his future. L.O.U.H. is only six years old, and he struggled in a forensic setting with even participating in an interview about his possible return. *See* Report at 32 (L.O.U.H. admitting he could not promise to tell the truth and refusing to answer Dr. Champion's questions). The Court cannot accord much, if any, weight to his views on whether he should return to Honduras or to his father. Thus, the exception does not apply as to him.

## IV. Conclusion

In the end, although Petitioner Miguel Alfonso Urquia Dominguez has demonstrated wrongful removal under the Hague Convention, Maria Hernandez Vasquez has established by clear and convincing evidence that return of their children would present a grave risk of future abuse and psychological harm to them. The Court also separately credits that E.S.U.H. has reached a sufficient age and maturity that her unequivocal objection to return will be honored. Accordingly, the Court denies the Petition for return.

A separate Order follows.

9/8/2026
Date

/s/
Paula Xinis
United States District Judge